In re Billie David **ROBINSON**, Debtor.

**Blossom Akst LEVY, Gilda Davis, and Milene-Opryland Music, Inc., Plaintiff,**

v.

**Billie D. ROBINSON, Defendant.**

**Bankruptcy No. 87–00785–C.
Adv. No. 87–0164–C.**

United States Bankruptcy Court,
W.D. Missouri, C.D.

July 30, 1987.

See also, Bkrtcy., 76 B.R. 145.

---

Stacy R. Obenhaus, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

Michael L. McDorman, Versailles, Mo., for Rita R. Robinson.

Jerry W. Venters, Jefferson City, Mo., for debtor.

## MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

This somewhat unusual and very interesting question as to the quantum and quality of debtor's homestead exemption is raised by debtor's Motion to Avoid Liens. By his pleading debtor seeks to avoid the judicial lien of his ex-wife, Rita R. Robinson, a/k/a Rita R. Bertelli in the amount of $5,900.74 plus $1,200.00 attorney fees. That amount was awarded to her by the Circuit Court of Morgan County on September 29, 1986, in a division of marital property. Debtor also seeks to avoid the judicial lien of Blossom Akst Levy, Gilda Davis and Milene-Opryland Music, Inc. in the amount of $500.00 plus $9,680.16 attorney fees as the result of a judgment under 17 U.S.C. § 504(c) and 17 U.S.C. § 505. That judgment was rendered against him on July 15, 1986, by the United States District Court for the Western District of Missouri, The Honorable Scott O. Wright, presiding.

The peculiar twist to the proceeding comes in what debtor claims as his homestead. Debtor owns, subject to certain liens, an entire block in Gravois Mills, Missouri. Needless to say, this is a far cry from owning an entire block in downtown New York City or even downtown Kansas

City. On the east end of the block is the Gravois Motel, a two story building that has been closed for six to ten years, and which structure probably reduces the value of the underlying real estate. On the west end of the block is the United States Post Office. It is housed in a one story building and debtor receives $135.00 per month rental. This is the result of a twenty year lease and there is still some two or three years remaining on the term. In the middle of the block is a business establishment called "Robbie's". At one time it housed a restaurant serving "Chicken—Steak—Seafood" (according to the signs on the false roof) and which housed the small dance floor and piano plus washboard that caused Blossom Akst Levy, et al. to sue debtor and obtain the aforementioned judgment for failure to pay the mandated fees for the rendition of the latest country and western music for the dining and dancing pleasure of its patrons. (The Court assumes, sans direct evidence, that the collected works of Bach, Beethoven, Wagner, Copeland and the like would rarely be heard, and that even Randy Travis might well be considered a "flash in the pan pop performer" rather than a true exponent of real down home music in such environs). In any event, the restaurant has been closed for some years (the evidence was unclear as to precisely how long) and is presently used for storage. On the east end of the restaurant is a bar. There was no clear evidence as to its dimensions, but the Court visualizes it as rather narrow and rather long and exceedingly dim. No music is played, no food is served, and in the Court's visualization it is the last refuge of a proprietor and a clientele that time has passed by. Perhaps only Faulkner or Tennessee Williams could find the proper descriptive words.

According to the debtor's testimony, it is behind or in the rear of that bar that debtor makes his home. He cooks his meals apparently in the kitchen that once served the restaurant and sleeps and lives in the other back rooms that perhaps were once used for storage. Debtor has no employees to assist in operating the bar. Because it is a common building that houses the now deserted restaurant and the nearly quiescent bar, debtor contends that the whole building in the middle of the block is his homestead and that the two judicial liens thereon should be avoided. Debtor does not seek to avoid the two liens on either the motel property or the post office property.

The first question the Court must determine is whether debtor may claim the subject property as a homestead. Section 513.-475, Mo.R.S., as amended by the laws of 1976, page 765 and laws of 1982, page 674, provides as follows:

"1. The homestead of every person, consisting of a dwelling house and appurtenances, and the land used in connection therewith, not exceeding the value of eight thousand dollars, which is or shall be used by such person as a homestead, shall, together with the rents, issues and products thereof, be exempt from attachment and execution. The exemption allowed under this section shall not be allowed under this subsection; but, if more than one owner of any homestead claims an exemption under this section, the exemption allowed to each of such owners shall not exceed, in the aggregate, the total exemption allowed under this subsection as to any one homestead."

Since Missouri has "opted out" of the Federal Exemptions, it is the state exemption of $8,000.00 that is at issue. Recent Missouri cases concerning homesteads are few in number possibly because of the extremely liberal "homestead" exemptions in Kansas which have no dollar limitation, only an acreage limitation. Thus debtors with substantial assets have been faced with the classic dilemma of whether to continue residing in the fair garden of Missouri with the limited personal exemptions, or suffer the psychic injury of forced residence in that area that early cartographers referred to as the "great American desert" and which now is labelled on more recent maps as "Kansas", thereby retaining more of their assets.

Although the "homestead" exemptions vary widely from state to state as to amount, type, and application, there are

three general principles running through all the reported cases. These are as follows:

1. Homesteads are the creation of statute and must be interpreted in light of the statute in question, being unknown at common law, and being usually referred to as "sui generis",

2. Homestead statutes are to be liberally construed.

3. The sine qua non of homestead is ownership plus occupancy.

Beyond those parameters, there frankly seems to be no limitation. Thus there are cases declaring a grist mill, a stable barn, and a storage barn a homestead. *In re Evans*, 51 B.R. 47 (Bkrtcy.Vt.1985). Likewise, an undivided one-half interest of a mother with her daughter in a residence. *In re Young*, 42 B.R. 892 (Bkrtcy.E.D. Tenn.1984). Likewise, oil and gas royalties under contract for extraction and sale. *In re Thexton*, 39 B.R. 367 (Bkrtcy.Ks.1984). Likewise, eight acres leased to a radio station for a tower and transmitter but within the farm of the debtor. *In re Cummings*, 40 B.R. 208 (D.Kansas 1983). Likewise, both parts of a duplex although debtor resided in only half and rented the other half. *In re Kuver*, 70 B.R. 190, 15 B.C.D. 826 (Bkrtcy.S.D.Fla.1986).

■ Thus while this Court had serious reservations about the applicability of the homestead exemption to the claimed structure at the time of the hearing, post trial research leads the Court to believe that the claim may well be cognizable. Clearly debtor has resided for years in the structure. Even the former wife who appeared and contested the exemption did not dispute debtor's assertion that he had "lived there for years" and even during the tenure of his ill fated second marriage from March of 1984 until July of 1985, only "visited or stayed over" a couple of nights a week at his wife's house. Clearly debtor owned the premises in his sole name. That circumstance had existed from the time of his first wife's death and any claim of any other party was terminated by the decree of dissolution from his second wife which awarded the entire block to him while awarding her house to her, each free of any claim of the other. Not so clearly resolved is the principal stumbling block in the Court's interpretation of the words "dwelling house and appurtenances" in the statute as encompassing a structure that is frontally a bar and was originally a restaurant and lounge. Sober reflection on this problem, however, has convinced the Court that: if a grist mill and barns, if a houseboat and boat slips, if a rented out half of a duplex, if eight acres leased to a radio station for a tower and transmitter all can be defined as homesteads, then there is no reason that a structure originally designed for some other purpose cannot become a debtor's homestead provided he occupy same as an owner. If there is some general rule to be extracted from all of the divergent cases, it seems to be that if the owner intends the structure to be his homestead and actually lives in it, then it can be his homestead, no matter what its form or appearance or original usage.

■ The parties in interest raise also the question of severability or partition in kind as the next issue. They suggest that at worst the Court should cut off (or cut out) the portion of the structure used as living quarters, allow it as the homestead, and allow their liens to remain on that portion of the structure not so used. In certain instances such a suggestion might be well conceived. Some Courts have indeed severed a portion of a structure where same was physically practical, thereby creating a homestead and non-homestead interest in one building. The most extreme example that the Court has found of such property (if not judicial) hairsplitting is reported in *Smith v. Guckenheimer*, 42 Fla. 1, 27 So. 900 (1900) wherein the court judicially cut a 95 foot two story building along a perpendicular line so that 39 feet on the first floor and 39 feet on the second floor were homestead and 56 feet on the first floor and 56 feet on the second floor were not homestead. However, even Florida Bankruptcy Courts have eschewed such Gordian solutions in more recent times as revealed by *In re Kuver*, 70 B.R. 190, 15 B.C.D. 826 (Bkrtcy.S.D.Fla.1986) wherein the Court refused to segment a duplex half occupied—

half rented because zoning laws would not allow sale after severance. Judge Hill in a recent opinion (*In re Patten,* 71 B.R. 574, 15 B.C.D 1023, (Bkrtcy N.D.1987)) refused to sever the one apartment occupied by the debtors from a building containing two apartments on the second floor and several shops on the first floor, all of which latter units were either rented out by debtors or used by them for business purposes. Therefore it seems evident that the so-called "perpendicular—line rule" while prevalent at one time has fallen out of favor, as well as use, in modern times. This Court declines to follow it in this case, not only because of its apparent fall from grace, but also for a more immediate and practical reason. That reason is that objectors offered the Court *no evidence* either as to the dimensions of the bar property, vis-a-vis the living quarters, or as to the existence of where the line fell within the building. Nor did the objectors afford the Court any evidence such as a survey or the metes and bounds from a survey that would permit the Court with legal certainty to define the line of demarcation and describe the separate parts in a form that any title insurance company would recognize or insure.

This leaves then the final issue to be decided by the Court. What is the value of the homestead in the center building? Two witnesses spoke to this issue—one for each side. Debtor testified, as the owner, that the center structure and land was worth $10,000.00 to $15,000.00 and had on it a deed of trust securing a promissory note for $4,100.00, thus leaving an equity of $5,900.00 to $10,900.00. The objectors called Ms. Jane Vierrock, Chief Appraiser for Morgan County who introduced the official records of the County. The County records show a land value of $7,500.00 for all the land under the motel and $7,500.00 for all the land under the restaurant, bar and post office. The County records show an improvement value of $12,500.00 for the motel and $28,100.00 for the restaurant, bar and post office. The witness was unable to testify as to either a land value or an improvement value of just the restaurant and bar building. Her testimony concerning the value of $12,500.00 for the mo-

tel improvements when she admitted the extremely dilapidated condition of such structure and implied it was unsafe to even go on the second floor, did not enhance the credibility of her testimony as to the other values to which she had testified.

One last bit of evidence must be mentioned. Debtor had executed a listing with Graham Real Estate for sale of the entire block and it had been advertised at least once by said realtor for $74,500.00. However, since the advertisement also said "Well Established Business" the Court must conclude that it meant the Post Office or else that is a real estate euphemism for "has been around a long time" if it is applicable to the bar. Surely it could not apply to either the motel or restaurant since neither has been in operation long before the execution of the listing. In any event, that item is hardly evidence of value, since it only indicates an asking price, not what a willing seller and an unsuspecting buyer might agree on as a sales price. Certainly the Court cannot ignore the fact that the only fully utilized structure in this whole complex, i.e., the Post Office, produces a gross rent of $1,620.00 per year before taxes, insurance and the like.

In view of the evidence, the Court finds that the value of the land and the whole structure comprising the property containing the claimed homestead is $12,500.00. Applying the undisputed balance of $4,100.00 on the first deed of trust to said value leaves a balance of $8,400.00. The taxes for 1987 apparently will exceed the $400.00 value over the $8,000.00 exemption allowed by Missouri law.

Accordingly, the Court avoids the judicial liens of Rita R. Robinson, a/k/a Rita R. Bertelli and Blossom Akst Levy, Gilda Davis and Milene-Opryland Music, Inc. on:

All of Lots 13, 14 and 15 of Block B of the town of Gravois Mills, Missouri; also of that part of Lot 12 of said Block B described by metes and bounds as follows: From the Southeast corner of said Lot 12 of Block B, run North along the East line of said Lot 12 a distance of 7.21 feet to an iron pin for the point of beginning; thence continue North 17.79 feet to the Northeast corner of said Lot 12;

thence West along the North line of said Lot 12 a distance of 150.0 feet to the Northwest corner of said Lot 12; thence South along the West line of said Lot 12 a distance of 3.42 feet to the North side of the North wall of an existing building; thence leaving said West line of Lot 12 and run Easterly along said North side of the wall a distance of 28.32 feet more or less to a Northeast corner of said building; thence run Southerly along the East side of the existing East wall of the building a distance of 11.3 feet to a corner of said building; thence run Easterly along the North line of the existing North wall of the building a distance of 14.0 feet to the Northeast corner of said building; thence leaving said building and run South 88 degrees 54 minutes East 108.7 feet to the point of beginning.

The Court DOES NOT AVOID the lien on Lot 16 and the South 10 feet of Lot 17 as requested by debtor for the reason that it appears to the Court that the Post Office is situate on that realty. The Court intends only to avoid the lien on that real estate on which the building known as "Robbie's" is situate. If a survey is needed to determine that question, any party in interest may apply to the Court for a further Order as to that issue only.